Good afternoon. We have one case this afternoon. It is Blystone v. Horn, and I believe Mr. Engel is going to be speaking first. Yes, Your Honor. Okay. You may proceed. Good afternoon. May it please the Court, my name is Sam Engel, and I'm here with Robert Denham representing Scott Blystone in this case, in this appeal. I would like to address the Court regarding the question of the Court's dismissal of the 59E motion. I plan to take ten minutes of time doing that. Mr. Denham would then address the Court regarding the penalty phase issue and regarding affirmance of the District Court's decision in that regard, and then we'd like to reserve five minutes of rebuttal time. That's great. Thank you. This Court's decision in Adams v. Gould is on point and should govern this decision regarding the 59E motion. In Adams v. Gould, the plaintiffs knew that the District Court was going to be entering summary judgment against them. How did they know that? They knew that because this Court had directed the District Court to do that after a collateral appeal. In that time, after this Court directed the District Court to enter summary judgment, there was a little more than a month. The plaintiffs had briefed to this Court an alternative theory for relief, but it wasn't fled in their complaint. The District Court granted summary judgment according to this Court's dictates, and then only after that did plaintiffs move for a Rule 59E relief and allege their new theory, which they've cited before. Will you be dealing with the jurisdictional issue? Is that what you're doing right now? I'm dealing with the 59E issue regarding interpretation of that rule. I would be happy to address the jurisdictional issue also, Your Honor. We sent you a letter that asked you to deal with it. We received the letters, but go ahead. I was just going to make the point that there has been an abuse of discretion ruling by this Court in similar circumstances before, and overturning the District Court. In terms of jurisdiction, our position is, as stated in our letter brief, Your Honor, that there is jurisdiction. We would respectfully request that the Court follow the Sixth Circuit, and I believe also the Seventh Circuit. That would be the Howard and the Curry cases, and that there is jurisdiction. There's multiple reasons why there would be jurisdiction in this case. But can it be argued that there's actually a new – I mean, this 59E motion, doesn't it constitute a new claim, as it were? I think it's fair to say that some of the claims are new, but there are some we also argue that it relates back. And there are – I think the timing consideration is important, as found by the Howard Court, and that this is something that happened – the Rule 59E motion occurred within 10 days or so after the District Court entered judgment. So we're not having something extending out like the nine months in the Gonzalez case in the United States Supreme Court. It's very different from that, and there are very different considerations from 60B6 and 59E in that regard. Your papers have – I have a slight confusion in your papers. You mentioned about Rule 15 and to amend. I read your Rule 59E papers as seeking discovery with an eye toward possibly amending at some point. At points in your brief, it seemed like you were representing that it was really a motion to amend. Which is it? I think it's fair to call it both, Your Honor, and we would ask that it would be liberally construed as such, and we briefed that point in our brief. That's what happened in the Gould case. Well, it was both a 59E and a Rule 15 motion to amend in the Gould case. But getting back to the jurisdictional argument, if I may, Your Honor, this case is different from Howard and Williams and all the other cases that I've seen cited in that Mr. Blystone got relief. He got relief. So it's different in that in the other cases there was relief denied. It's true. It's a way to distinguish it, but analytically, why is that important? Well, it's important because if this court were to send this case back to the district court and reverse the penalty phase relief, then judgment obviously would have been open for the entire time, and it would not be something that would be allegedly dilatory in that respect. So we think that's an important distinction. Discovery would be relevant to the matter that needed to be discovered. Discovery would be relevant to the penalty phase, Your Honor. Yes, we believe that certainly if there is evidence that we have some indication of the record that there was not a robbery or that there was not a robbery as alleged by the Commonwealth, that is relevant to Mr. Blystone's sentencing. If there's further evidence, and again, we have that in the – we've set some of that forth in our petition, that there was evidence of intoxication to the extent of voluntary intoxication, that's absolutely relevant to both the first-degree homicide conviction and to the penalty phase. As the court, I'm sure, is well aware, matters going to the offense, matters going to the character of the defendant, matters going to his background are all mitigating. So it's our position that discovery would be relevant both to the robbery, which was the sole aggravator, to the first-degree homicide conviction, and also to the penalty phase. And in terms of that, Mr. Powell stated in terms of intoxication that he told the Pennsylvania State Police they were intoxicated. And while the State Police report in this case, documenting his statement, says that Mr. Powell told them that they went and bought liquor and went to a party, it does not mention intoxication. This all came to light because of the Munchinski case, and Judge Nygard's familiar with the Brake Iron case, where these prosecutors have been found, even by the Superior Court in Munchinski, to have withheld evidence. Munchinski's Superior Court specifically said that there was Brady evidence that should have been disclosed that wasn't disclosed. They went on and said it's not material, but that, for our purposes, doesn't change the fact that that's what they said. And the PCRA court – I'm sorry. Mr. Blystone had a chance during the trial, the initial trial, to say to the counsel, this portion of this police report is inaccurate, has been redacted. I don't know if he'd use the term redacted, but has been changed, has left things out. And he didn't do that. Now, he is the one who would know if the police report was being accurate or not. And if he saw inaccuracy, wasn't it his responsibility at that point to say something about it? Your Honor, I think it would be not necessarily his responsibility to say that. It's his counsel's obligation to go and follow up. But even more importantly, it's the Commonwealth's obligation as ongoing duty to disclose expulsatory evidence. And Mr. Blystone is not educated in the law. He doesn't know what to tell his counsel what's important and what's not. When I say he should do something, I mean his counsel. Yes. And, Your Honor, the Commonwealth is expected to abide by its obligations. I didn't even discuss the original PCRA court decision in Munkinski, which found many, many, many Brady violations by these prosecutors. So this is something where the trial lawyer, who is a very new trial lawyer, only a few months of experience, relied on the police reports. He doesn't know what's not there. It's something where finally in October of 2004, Mr. Blystone is put on notice that there's serious problems with the way this is going on, with the way discovery is produced in this county by these prosecutors. And also then he goes and talks to the lead investigator, and the lead investigator says, and he didn't say this in 2000 when the lead investigator gave a first affidavit in this case. Only in 2004 does he say, yes, these reports have been altered. They've been changed, but I'm not going to tell you the extent to which they are because I'm concerned about my parole. A lot of your adversary's argument is, hey, you know what? Even assuming all that, you waited too long. And that's what they say. I mean, how do you respond to that? You didn't need every single piece of evidence to bring a claim. I mean, I don't think the law accountants that. Why didn't you bring it earlier? Why didn't we bring it earlier than April of 2006? Yeah, after the judgment in the district court case. After the judgment in the Common Pleas court case. And Munchinski? Well, we had that too, but I mean. . . In this case itself. In this case itself, the Traverse, our reply brief, was filed in January of 2002. The Munchinski decision that we state as the new fact was in October of 2004. Yeah, but the district court decision was in March of 2005. It was in March. And so our position is that given the Commonwealth's ongoing obligations, which it hasn't met, given the length of time of the statute of limitations for newly discovered evidence, which is one year, under 2244D, that that is not untimely. Just because when counsel does something within the statute of limitations, it's not untimely. And also, I would submit that the Adams v. Goulding case is on point to show that, you know, just because somebody knows a judgment's coming down the pipe, doesn't mean that they're too late when they file a motion under 59E. That's my time, Your Honor. Okay, thank you. Thank you very much. Thank you. Good afternoon, Your Honors. I'm Robert Dunham. I'm going to be discussing the ineffectiveness issue in this case. As Your Honors are aware, this is a case in which the district court granted relief partly on the ineffectiveness claim and denied relief partly on the ineffectiveness claim. Just to set this up, this is a remarkable ineffectiveness case. In fact, it's one that can never happen again in Pennsylvania. After this case went through in post-conviction, the Pennsylvania Supreme Court adopted Rule 801, which makes it so that no lawyer with this little experience, this little training, and this little knowledge about death penalty law could ever handle a capital trial in Pennsylvania. But the background is that Jeffrey Whitecoe joined the Fayette County Public Defender's Office in September of 1983. He was assigned to the Blystone case when Mr. Blystone was charged in December. A preliminary hearing was held on December 21, 1983, roughly three and a half months after he had joined the office. He was a part-time public defender. There were five public defenders in the office, all of whom were senior to Mr. Whitecoe, and yet the Fayette County Public Defender's Office put him in the untenable situation of having just three and a half months' experience, no homicide trial, certainly no capital trial, and all of a sudden Mr. Blystone's life was in his hands. He had tried only six jury trials at that time. As I said, never capital case, never murder case. And he tried the case alone, which is astonishing, without second chair or co-counsel. The public defender, the chief public defender, ostensibly was available to assist him, but didn't. He was there solely at the time of the preliminary hearing and showed up for one day at the voir dire. Now, we raise the claim that this is constructive denial of counsel. That's not the issue that's before the court. The issue that's before the court is whether counsel was ineffective. And one of the key issues is what was counsel's understanding of mitigation, because there is a waiver that we can't pretend didn't occur. The question is, what is the extent of the waiver? What was the advice from counsel to Mr. Blystone concerning that waiver? And in understanding what that advice was, it's critically important to understand what Mr. Whitecoe's knowledge of mitigation was and what his predicate investigation is. Because in all the cases that are out there, there is nothing that says that you can excuse or insulate from ineffectiveness review a predicate failure to investigate and prepare mitigation, based upon something that happened on the day of sentencing later on. So let's take a look a bit at Mr. Whitecoe's background. Let me ask you a question first. Just after the arraignment, Mr. Whitecoe goes in and speaks with Mr. Blystone, and Blystone says, you know, get me off, but if you don't get me off, let them do to me what they will. I don't want to spend my life in jail. I don't want you to try to excuse us in any way. Just leave that thing alone. At that point, is the attorney, the defendant's attorney, under any obligation still to do background investigation for the penalty phase? Certainly. Certainly. But, Your Honor, I would say the record fairly red doesn't support that. That's what Mr. Blystone said. But, yes, and the prevailing standards are important. So if that had started at that point, then after the guilty verdict, when you got to the penalty phase, Mr. Whitecoe would have a very different fund of knowledge to argue with on the issue of whether there was waiver or not. Certainly. Is that basically one of your contentions? That's one of the contentions. But there are a whole range of things, Your Honor, because whatever this waiver is, and we'll get to that in a moment, it's clearly poisoned by the predicate failure to do any investigation at all, and what it is that Mr. Whitecoe advised Mr. Blystone and how Mr. Blystone acted in reliance upon that defective advice. When we're talking about Mr. Whitecoe's background, he testified in the PCRA hearing that he had never attended any capital seminars. He had no specific training on death penalty law, and he had no resources of any kind to meaningfully investigate mitigating evidence, even if he understood what it was. So he went in with no understanding, and incidentally, and I won't go into this in detail, but Your Honors can take a look at the Commonwealth v. Stoico case, the only other case that had been in Fayette County, the only other capital case, where there were similarly horrific conduct by the public defender's office, stipulating the presence of facts that led to aggravation and failing to present any mitigating evidence. The one lawyer he could go to is a lawyer who was involved in that, and the Stoico opinion, if you look at Justice Hutchinson's dissent and Justice Nixon's dissent, talks about how there was a complete failure of the Fayette County public defender's office to prepare, and in fact, when they came before the Pennsylvania Supreme Court, they had no understanding of controlling U.S. Supreme Court law. The only people that Mr. Whitecoat could go to were the very lawyer, was the very lawyer that the Pennsylvania Supreme Court at the same time was saying had no knowledge of death penalty law and hadn't even bothered to acquaint himself with death penalty law. That's the advice that Mr. Whitecoat was getting inside his own office. Well, when it comes to resources to try to work up this case, Mr. Whitecoat testified on 1131 of the record that he had access to an investigator, and interestingly, the Pennsylvania Supreme Court seizes on this as saying that there was a reasonable investigation, but it's completely false. He testified he had access to the investigator, but the investigator was only for guilt purposes. His investigation was limited to the guilt phase of trial, that's a quote, and that no other non-lawyer personnel was assigned to the case. So he had no penalty phase investigator, he had no other non-lawyer personnel, and no other lawyers helped with the preparation of the case from the outside who had experience. The only one was the chief PD, and we've already talked about the problems that he had. So that's the background in which Jeffrey Whitecoat goes about conducting or not conducting a mitigation investigation, and in fact it's an abject failure to investigate. The record is absolutely clear what it is that Whitecoat actually did. His testimony is that he interviewed Scott Glystone, he interviewed Scott's father, Scott's mother, and quote, his one sister, whose name that Whitecoat could not recall, and in fact Scott Glystone has three sisters, so he was even wrong about his one sister. And he did not talk to anyone outside of the immediate family, his testimony on 1160 of the record, 1146 of the record. The only, the one sister was the one who was always with his mother at trial, making clear and corroborating his sister's testimony, and she was never interviewed by him at all. There was an offhand conversation in the hallway, and the district court so found. In fact, the record establishes that he did not ask for names, addresses, or phone numbers of friends, and he didn't talk to friends, he did not recall asking for names of other relatives, and he didn't talk to other relatives, he did not recall seeking records, he did not obtain the Navy records, he did not obtain, despite the fact he testified he knew from talking with Scott that Scott had been in the Navy, he did not obtain the Maryland Department of Corrections records, despite knowing that Scott had been incarcerated, and despite the fact that parole eligibility had been part of the testimony during the guilt phase of trial. And those records screamed out with mitigating evidence, but he never bothered, he never bothered even to look at it. He didn't seek school records or medical records, and no one in his office personally consulted with a psychiatrist or a psychologist to see if there was any mental health mitigating evidence. So this is someone who was not prepared to investigate, did not have resources to investigate, and indeed when it came to the question of mental health investigation, what he said was that he did not have access to a defense expert on that. He said that Mr. Lepore controlled the purse strings and that there was no access. The court is able to appoint a mental health expert, right? Absolutely, absolutely. And what Mr. Whitecoat did was he operated under a complete misunderstanding of not just controlling death penalty law, but misunderstanding of mental health because Scott Blystone was sent for a competency evaluation, which is a very different matter, and all the mental health experts in this case testified about the difference between a competency evaluation versus an evaluation for affirmative defense as the first degree, versus a mitigation investigation. And they clearly testified, it was uncontroverted, that the mitigation, I'm sorry, that the competency evaluation here was nothing like a mitigation investigation. Not only was it not a defense investigation where there'd be some privacy and you could consult within the bounds of privilege to ascertain whether there was something that was mitigating, it was court appointed. It went to the court, it went to the prosecution. And despite that, and it didn't cover his background, his history, and they didn't have any of the records, they didn't have any of the information from the family members about things that might be significant. And despite that, according to the doctors who testified, uncontroverted by anything the Commonwealth put on, there were red flags of mental health mitigation on there. And there were red flags that were different from even counsel's limited misunderstanding of what mitigation could have been presented from his family. So it's a horrible thing. You've done a very complete job explaining that part of it, but still we get to the elephant in the room, if you will. Sure. What happened to actually trial and whether prejudice can be established under Strickland? Could you turn to that? Sure. I mean, you've got testimony, I mean, you know, the question that your adversary seized on, any other evidence. You've got the attorney testifying at the PCRA hearing. He did not want me to present anything, you know, without any type of limitation. Why is there prejudice in this case? Well, the key issue here, Your Honor, that you're alluding to is Landrigan. Yes. And let's start with some context. Because in Landrigan, the United States Supreme Court says, in the constellation of refusals to have mitigating evidence presented, this case is surely a bright star. No other case could illuminate the state of the client's mind and nature of counsel's dilemma quite as brightly as this one. I mean, Landrigan, there is no question, there is no question about the waiver and the scope of the waiver. Landrigan wanted the death penalty. And he, in fact, told the judge, bring it on. Didn't your client say, don't beg, I don't want you begging, if I'm found guilty, you know, that's it? Yes, but. And the but is extremely important. And the but, by the way, is controlled by this court's decision, the one decision it has so far on Landrigan, that's the Brian Thomas case. Yes, he did, but it's clear the context in which that occurred. And that context is so very different from any of the cases in which that kind of waiver has been said to waive the investigation of other mitigating evidence. If I can step back for a second to talk about Landrigan, and then I'll get to your question, Your Honor. Yes. In Landrigan, the court said that prejudice could never be shown because Landrigan was not under any circumstances going to allow mitigation to be presented. But it arises in a critically different context, and that's this. In the Landrigan case, Landrigan's lawyers have investigated mitigating evidence. The judge, and Landrigan has interfered for a long time. Excuse me for one second. Could the clerk put an extra five minutes on the clock? Thanks. Both sides get it. Landrigan actively interfered. And when it got to the stage in the penalty phase, when counsel was to present mitigating evidence, the court conducted a colloquy, not of Landrigan, but of a lawyer, to ascertain what mitigation would have been available. And the lawyer starts to talk about the range of background mitigation that he was going to be presenting, and Landrigan interrupts. He had affirmatively told the witnesses, I don't want you coming, don't testify, and they refused to testify. Then counsel goes beyond that. Counsel says, well, you know, there also is evidence that he'd be a good provider. And Landrigan interrupts and says, if I wanted that to have been presented, I would have allowed the witnesses to come in. And then he said, and, you know how I was a good provider? I went out and I committed robberies to support my family. So he then sabotages that. Defense counsel then wants to talk about mitigating aspects of Landrigan's background and record. And so Landrigan had a prior homicide offense. The aggravation was much stronger than in this case. He had a prior homicide case, and defense counsel was going to say, well, there was an element of self-defense. And Landrigan interrupts and says, no, there wasn't. I just stabbed the guy. And then there was another prison episode. And counsel tried to say, well, there was some self-defense involved in that as well, because the person who was stabbed that time knew the other person whom Landrigan had attacked. And Landrigan again interjected and said, no, he didn't. I just got into an argument with him. I stabbed him 14 times. It's lucky that he lived. And then he says, bring it on. I mean, it's absolutely clear that Landrigan is sabotaging, affirmatively stopping anything from taking place. And then another absolutely critical distinction for purposes of proving prejudice, the evidence that Landrigan's counsel sought to introduce in the post-conviction proceedings, in the language of the United States Supreme Court, simply overlapped with the exception of one alleged mitigating fact, which was unprecedented evidence that he had a genetic propensity to violence, which the court dismissed as being of minimal mitigation value, especially in the context of someone who had just bragged to the fact finder about his violence. So, of course, there was no prejudice. He had been told with specificity a full range of mitigation, and he had affirmatively rebutted or sabotaged or disclaimed every single aspect of the case, and they had nothing new to present. This case is very different. Brian Thomas is very different. And the language of this court in treating Brian Thomas, I think, is instructive. In Thomas, here's what the colloquy was. The fact finding was that Thomas had waived all mitigation, and this court said was not supported by the record. Although Thomas had said that under no conditions did he want to take the stand, he agreed with the court when the court said, I would like to repeat it's your decision not to take the stand at this penalty stage of the hearing or even to present any evidence, and that there is no witness in existence you would like to call, sir, at this time, yes or no. And he refused to stipulate as to his age and his mitigation. Now, well, first off, that's not an AEDPA case, right? No. That's not an AEDPA case with respect to the determination of law. But when it comes to fact finding, the fact finding obligation is the same because this was historical fact found by the Pennsylvania Supreme Court, and it was just not supported by the record for the same reason that it's not supported by the record here. Thomas never indicated that he would interfere with or otherwise prevent the presentation of all mitigating evidence, regardless of its nature. At sentencing, the college be focused on two things, just as here, whether he desired to testify on his own behalf and whether he had other witnesses to call, and that he answered no, this court said, does not mean that that had effective counsel-prepared mental health evidence. He would also have declined that presentation. Therefore, we cannot conclude that the conduct at the sentencing eliminated all possibility that the performance caused him prejudice. And this case, you know, this case, I would argue, is even clearer than Thomas. And the reason it's even clearer is because we know with specificity what it was that counsel actually advised Blystone about. He obviously couldn't advise him about what the sister said because he hadn't interviewed them, or the relatives, or the friends, or the associates, or the Navy and DOC records, or the mental health mitigation. He couldn't have advised anything on any mental health. He couldn't have advised on extreme mental or emotional disturbance or significant impairment because he hadn't investigated anything on that. And, you know, what he could conceivably have advised on was the language in the mitigating statute because he said that he had gone over that with Mr. Blystone. But this is a lawyer who's practicing law three and a half months and doesn't understand death penalty law, and there is a flaw in the language of Pennsylvania's death penalty statute. The only reason it's constitutional is because of the construction of the E-8 catch-all mitigating circumstance. The Pennsylvania catch-all mitigator says any other mitigation relating to the character or record of the defendant or the circumstances of the offense. It says nothing about background. And so counsel who knows nothing and who, you know, when he was asked about family background said, well, you know, what we're talking about is Scott would get frustrated at things, and so we put on dad to talk about how when he couldn't do something he'd get frustrated. I mean, that was the extent of what he understood it to be. But, I mean, again, your adversary points out, look, he said, I don't want you begging. If I'm guilty, that's it. The judge says, do you have any other evidence to offer, you know, in respect to mitigation? Explains to him that, you know, once you make this decision, you're not going to be able to appeal it if you decide to put that thing on. I mean, isn't that pretty straightforward? I mean, we can't mix up, you know, there's cause and prejudice. You know, let's just talk about prejudice. I think it's pretty clear that there's a waiver of something, and the record supports that. And what the record supports is, because the context is so clear, it supports a waiver of what he was advised about. And it's also pretty clear what he was advised about, because at trial, on the record, at 967, Your Honor, after a lengthy discussion with Mr. Blystone, he states that he wishes to offer no evidence. I've talked to his parents and interviewed them on several occasions, and I wish to put them on the stand, and I wish to put Mr. Blystone on the side. So it's clear, you know, it's the parents. And then the question to Mr. Blystone, do you wish to testify or have your parents testify? I have no testimony and no witnesses. So, you know, it easily falls within Thomas. And then Mr. White, though, says, I tried to explain to him that I wish for him to take the stand or his parents. So it's absolutely clear at that time. And then in the post-verdict hearings, it becomes even clearer. And even the Commonwealth buys this, because it's the one who brings this up. At the time of the sentencing portion of the trial, did you not advise Mr. Blystone to testify on his own behalf, Mr. White, though? Mr. White, though, says, I advised him either to testify or let me call his parents. And he did not wish to testify or have his parents testify. Right. And that is, I believe, at 1087. And then 1034-35, Blystone testifies about what his explanation, what his understanding was. He did tell me that I should take the stand in the sentencing phase between life and death and that I should call my parents. And at that point, he explained how he thought it would be hopeless to put the parents on. I thought to get up here after everything was said and try to convince the jury to spare my life, I didn't think would do much good as far as my parents go. They went through six or eight months of this with me before the trial. And they broke down a lot. And they cried. And it hurt them. And their name was involved every time my name was in the paper. It reflected on them. My mother had lost her job because of me. My father was nearly fired because of me. And I didn't want their name in there. I didn't want them on the stand to break down. I thought it would make things worse and it would hurt me more if my parents got up here and broke down and cried. He did want me to take the stand before sentencing and my parents, but I didn't want to. There's no question, no question that when he says he doesn't want anyone else brought into it, this is who he's talking about. He's talking about his parents. And the district court was absolutely correct when it found that there's nothing in the record to support that he would not have allowed any mental health evaluation and so forth. In fact, the Mabee report says he was cooperative with the mental health. There is absolutely nothing to contradict what the district court found. This report is supported by the record when the district court says that this is overwhelmingly prejudicial. In fact, even the Commonwealth hasn't disputed that. I mean, we're talking about a range of mitigating evidence that is powerful, uncontested evidence of brain damage. And the idea that a person who's got brain damage would somehow waive it without knowing about it or having anyone explain to him what his mitigating value was. Someone who has bipolar disorder, which you don't want to be confessing to but doesn't even know about, hasn't been explained to him, wouldn't involve putting his parents on. Okay, counsel, we've got to bring any of that in. Your light's on. We can pick that up on rebuttal. Thank you. Thank you very much. Sure. Ms. Zapp. Good afternoon, Your Honors. I'm Amy Zapp, and I appear for the respondents who are appellees and cross-appellants in this court. I'm going to begin by addressing the 59E motion issue that the court asked us to supplement the record with. As I understood the court's request, on behalf of the respondents, we were to address whether or not there was jurisdiction on this issue. And that's essentially how I focused our response, and I think that is the question here. So it's become somewhat muddled here, probably because that serves the purposes of the appellants here. But the question before the district court is, could they entertain that motion? That's quite simply the question, the 59E motion. And that depends, I think, as the court said in its letter to us, on whether you consider what the motion was. Was it a genuine 59E motion, or was it something else? And in this case, we say it was something else. It was effectively an attempt at a new petition, a second or successive petition, which under Section 2244B has to go through a series of permissions by this court, a three-judge panel of this court, before it could be entertained by the lower court. And this was a way of attempting to sneak into the lower court action, albeit in a very tardy manner, a whole new claim that was never before the court before. And as we concluded, based on our review of the cases, we think that this situation is probably the closely analogous to the Gonzalez decision, which dealt with the 60B motion. And for the same reasons that Justice Scalia outlined in that situation, namely that the Federal Rules of Civil Procedure only apply to the extent they're not inconsistent with Section 2254D EBSA analysis. And as he explained there, in the context of the 60B motion, there are certain constraints that 2254B placed on this type of litigation. And in this situation, clearly you had a request that, walk like a duck, quack like a duck, was this new and successive petition. It should have been brought to this court. There were also other problems we highlighted in our response to that, initially when it was before the district court. Now, by allowing it to go forward as a 69E motion, you're allowing the petitioner to bypass the state court review, the exhaustion requirements. You are allowing him to try to bring an untimely claim. Now, I hear Mr. Angel tell us today that this is some kind of hybrid motion. It's a motion to amend and a motion to resolve for judgment. Well, I have to say, if that is standing in place, then they had an obligation to say that in their motion. We had a right as respondents to know what was being moved here and under what rule of civil procedure. And if this is a relation-backed motion, we had a right to know this so we could address it. Was Rule 15 cited in those Rule 59 papers? I don't believe it was, Your Honor. I believe it was only Rule 59. And the other thing I wanted to address, because it's in their papers and I don't want the court to think we're agreeing to this. No matter how many times I have read this, I still don't get this finality argument that they're making, how this is all distinguishable on finality. I think there is no dispute that the order that is now before this court is a final order. My understanding, and I think the case law will bear me out on this, that a final order is any order in a case that has the potential for completely resolving the case. And this one does. It resolves all of the guilt-faced issues. And if affirmed, it will resolve the sentencing-faced issue because it will give complete relief to the petitioner on that. They'll get a new hearing if it's affirmed by this court. Your adversary brought up the point that in both their papers and today here at Oral Argument, that in some of the other cases, they could be distinguished because, in this case, the petitioner was partially successful. How do you respond to that? To me, that is a very odd argument because, again, it looks to me like it's, for lack of a better term, some kind of transient finality argument, that an argument is not final if you've gotten relief in the matter. I don't know of any situation where that is the case. You know, it's a final order that could be vacated. I mean, that's ultimately what happens. If we were to prevail in this case, as we believe we should, the court would be obliged to vacate the lower order. And in this instance, because there were grounds that were not addressed, typically it would be remanded so the district court considered those other grounds. But that doesn't affect the finality laws that now stand because if the court affirms that order, it's all over in terms of the copy-paste stuff unless that order is subsequently accepted by another court. And that's the point we wanted to make here. And we think that we've laid it out in detail in our paper. I'm not going to repeat it now. But we think there's a very good argument that the Fifth Circuit's approach here, which coordinates with most of the other circuits, is the right approach, that you have to consider this to have been a secondary success of the petition, which meant the district court did not have jurisdiction. And because it didn't have jurisdiction, its order in this regard is effectively nullity. And there's no genuine basis for a certificate of appealability anymore, or the court has to dismiss this appeal. There's no jurisdiction on this issue. And so that is our position, and we think that that is how the court should rule in this way. What if we determine it was a Rule 59e motion? Did the court abuse its discretion in denying it? No, and as we've said that in our briefing detail, Judge Ross, we believe that if the court concedes it to be such, that there was no abuse of discretion. This is something the district courts have the right to evaluate and make a judgment call. And the judgment call in this was certainly well within the parameters of the district court's discretion. The district court gave very good reasons why this would not be appropriate to do this. And that it was, in fact, dilatory. This information, first of all, is suppositious. It's the most generous way I can characterize it. And an attempt to tar what happened in this case with what happened in other cases. This is nothing more than an involved attempt of guilt by association or culpability by association. There is no support in this record for any genuine basis to do this, and that's what the district court said, and I believe that's correct. We've laid out those reasons in our papers, and I believe that there's no reason to change our position on this. We, in fact, would reaffirm it, that the material that the district court looked at, evaluated, and came to a conclusion on was well within the parameters of its discretion. And its ruling, if it was construed to be a 59E motion, should be upheld by this court. Of course, our standard of review is abuse of discretion on that. On that issue, yes, it is, Your Honor. And I think we've noted that in our paperwork, too. If I may, then, with the court's permission, I'm going to turn to the issue that's in our appeal, because I certainly don't want to use my time and not talk about it. Actually, if you'd hold up for a minute, did she get the extra five minutes? Well, she gets five minutes, too. Thanks. Thank you, Your Honor. On this issue, there's a couple things I need to say at the outset, because it really does affect this quite significantly. And that is, this case, as you know, has been pending for a good while, and the district court's decision in this case is almost six years old now. And in the six years that have since passed, the Supreme Court has provided a great deal of more explication about how you have to approach paper's review of ineffective misconduct. And that's another outfit in the room here, Your Honor, to borrow your term. And it's actually the most important outfit in the room, because the court most recently has clarified what is the proper approach. And in a nutshell, our position here is that the district court, in concluding that there was an unreasonable application of the Supreme Court present, meaning Strickland, was incorrectly oriented. And in saying that, I want to make sure that you understand that I am not taking the court to task for disregarding the law or anything like that. I do believe the district court here appreciated that EDSA has changed the field, and it appreciated that there's got to be deference. But like so many other courts who rendered decisions at that time, as the case law shows, it took this and approached it the way the existing case law suggested. Isn't it inherent in the cases involving ineffective assistance of counsel at the penalty stage that the investigation needs to have started long in advance of the guilty verdict? If you're saying about current cases, I think current cases, the cases that postdate this case, suggest that... I'm not sure they agree it has to be long in advance, but it has to be sufficiently in advance to allow counsel to gather relevant information and make intelligent decisions, including decisions about whether you will waive witnesses, whatever. This is a key problem to what my opponent has just been arguing here, and I want to focus on this, and that is we can't lose sight of the fact that all this took place in 1984. And that is enormously important, because Strickland requires a temporally relevant evaluation. And a lot of the material that Mr. Dunham was talking about... The ABA standards and all? Yes, and not just that, but he's talking about how things could never happen this way, and he's faulting counsel for doing various things. This is 2020 hindsight. And in evaluating counsel's conduct, you have to look at it in the time and in the year it took place. And that is clear from Strickland. Strickland has said that from day one. But more importantly, and this is something my opponent has completely ignored, in the last several cases out of the Supreme Court of the United States on ineffectiveness, they have said that when you have an EDCA-based review of ineffectiveness claims, your job as a habeas court is not to do a de novo review or analyze it and then measure whether or not the state court's decision was objectively reasonable. Your job is to start from a deferential position, and you have to search out what theories or bases there could possibly be for the ruling of the state court, to identify if there's any plausible, reasonable basis the state court could have reached a ruling it did. That's job one under the new articulation, the clarification. There are cases like Harrington v. Richter and Cullen v. Penholster's report. They reiterate that this is a very high standard, that federal habeas review precludes relief unless you can meet this standard, that you have to first determine whether or not there was a reasonable basis for a state court reaching the conclusion that counsel's conduct met Strickland's deferential standard. And once you do that, then you have to ask whether reasonable, fair-minded jurors could disagree about whether it would conflict or be inconsistent with controlling Supreme Court precedent. And under that analysis, there is no way relief should be granted in this situation. Given what transpired here and focusing on what existed at the time it all took place, as Strickland requires, plainly there's a good basis for the Pennsylvania Supreme Court's ruling and for concluding that there is no habeas relief required here. The Supreme Court had before it information that the attorney representing Mr. Blystown was clearly aware... The Supreme Court of Pennsylvania. Yes, was clearly aware of his obligation to do this. Do you have substantive evidence? To gather mitigating evidence. He clearly acknowledged that in his testimony at the PCRA proceedings. He acknowledged that he had an obligation to do this. And he... Now, Mr. Dunham disputes the quality of his work, and he's disputing it with the eyes of decisions and rulings 20 years later. But there's nothing to say that back in 1984 when all this was taking place, that counsel's conduct here wasn't within the wide range of a professionally acceptable behavior. If he had, as he acknowledged, an obligation to prepare for the death penalty case, to prepare for mitigation, is the scope of preparation that different today than it was then? I think the answer is what would be reasonably expected of persons then and now are different. Yes, you are. I don't know. I may not be that old, but I remember there were experts back in that time. Well, of course. And the prevailing standard, the ABA standard, which, of course, doesn't establish a firm obligation but is a guideline or a signpost of some sort, didn't even speak specifically to this issue. It'll talk generally in terms of a lawyer's obligation to investigate regarding the case. But the testimony here in the record shows that... It's a little more than that. I mean, they point out, look, there are all kinds of things around to give you reasonable notice that there is something to look at. You know, all those different things, Navy records and all the things that they point out. Well, that post states what happened. And that's the other thing. They don't tie that into his knowledge at the time and the actions that he took here. But he did say he had interviewed his client extensively, his client and several family members. And I have to point out, too, Mr. Denham denigrated Counsel's performance on the basis that he couldn't remember one of the defendant's sister's name. That testimony was 11 years after the trial in this case. I don't know about you, but by the time I leave this room, I might not remember people's names of people I met in here today. Well, are you saying that the ABA standards are irrelevant?  I said that they can be used as science posts. But they are not written in stone in terms of measuring counsel's performance. The Supreme Court said that repeatedly, including in Strickland. It's something to which you can look. And there's no suggestion here that the state courts in evaluating this weren't informed by those standards. I mean, the courts that evaluated this fellow lawyer's performance was on a regular basis, which reminds me of another thing. And I wanted to add before I forget it. And that is Mr. Oiko, I'm not sure how you say his name, trial counsel. Yes, he had relatively short time as a trial lawyer, comparatively speaking. But just because he did that doesn't mean he was inept or incompetent. And he had a year's experience as a law clerk, too. So he was no stranger to a courtroom. He had seen things happen. He had observed. So he had a background. He had tried six jury trials. So this wasn't literally his first case. But everyone has to start somewhere. And the question that had to be evaluated here was whether or not he was aware of his obligation. What, if anything, he did. Well, he said he was aware of his obligation. Right. And he took steps to do something. But then we run into the problem that is key here. He had a client who said he didn't want this. When did the client first say he didn't want it? Early on. Well, early on, Your Honor. And then he reaffirmed that when he met with him after he initially. I know it's in pages 11. Mr. Oiko's testimony in the PCRA is that the relevant portions describing this are on pages 1163, 1164 in the record. Your client tells a lawyer in a capital case early on, I don't want you to do any investigations. So then the guilty plea comes in and the penalty hearing comes up. And the client says, please help me. Don't let me go to the death chain. Right. So if the lawyer has taken the first suggestion not to do anything, he's going to be in a very bad situation unless during the interim he has done something. Right? I would say obviously. But, Your Honor, that didn't happen here. He didn't pull the plug on his investigation. Okay. If the guy says early on don't do anything, doesn't counsel still have an obligation to do something? And he did. Because up until the penalty hearing starts, the defendant can change his mind from there. I agree. Find out something that is relevant that will help the client change his mind. And Mr. Whitecoe knew he had an obligation to do things. If he didn't know the exact extent of what he needed to do, I know when I was a young lawyer I went and asked people, and thank God they helped me. And he clearly had knowledge from some source, whether it was by his own research or whether it was from counsel from somebody else who was older and more experienced. He did know he had this obligation. But, Your Honor, what's key here is he did not. When Blystone said I don't want this, and let me tell you, Mr. Whitecoe, the trial counsel, characterized that. It's a conversation with Mr. Blystone. It's an all or nothing kind of communication. Blystone said if I get first degree murder, I don't want to spend my life in prison. And he repeated it in the conversation. But that didn't stop him. We agree that that does not remove the obligation from Whitecoe to do investigations. I think in this situation, at that stage, it probably did not. But Mr. Whitecoe did not stop. He continued. In the interim, the investigation should have been ongoing, and it didn't happen. Well, he had done interviews. He had a plan. He had a strategy about what he was going to do if there was a penalty case. And then when it comes to the penalty case, not only did he have a plan in how to deal with it, his attorney, or he tried to persuade Blystone, he spent two hours trying to convince him to do this, to go with this. That is in the record. And we have quoted that at length in our brief, Your Honor. That's the first thing he tells the trial judges. I've just spent two hours trying to convince my client that he needs to put this evidence on. Did he tell them about the Navy evidence and about the Bureau of Prisons evidence and about the hospital evidence? He did not. But, Your Honor, it did not. Should he, if he had done an adequate investigation, have considered all those things and told them about it? I don't think we could say that as a certainty, Your Honor. I think you can. It's certainly stuff he could have explored, but there is no one fixed checklist for developing this. He had a plan. His plan appeared to be to try to evoke sympathy by putting up the family members talking about what a terrible life Mr. Blystone has had and putting Mr. Blystone up to put on additional information about him, which may have covered a lot of this. We will not know that because he never took the stand. And because the attorney never did the preliminary investigation? No. He spoke with his client. His client told him about his experiences and troubles in life. He was going to go with that as his approach to getting mitigating factors. Well, isn't it going to be a little more persuasive to the jury if it's more than just Mr. Blystone saying it? Well, I'm not convinced that that necessarily would be more persuasive. I mean, there is a school of thought, as you all know, that that kind of evidence is excuse-making. Sometimes it could be more persuasive. That's what mitigation is, excuse-making. But alienating, in an alienating way. There's a lot of people who could look at that and say he's not taking responsibility for his actions. That's why you want other people to come in and testify about the problems and the source of the problems and the effect they may have had on Mr. Blystone's ability to plan and anticipate what he was going to do. That is one school of thought. Another school of thought could see that evidence as someone being paid to come in here to try to get this guy off. And it may be actually more effective for Mr. Blystone, especially if I don't know him and we have nothing in the record to describe his demeanor or the way he speaks, but it may be very affecting. I mean, someone may look at him and think, well, yeah, he has his problems and I can see how it resulted in this, and I don't think we should sentence a guy like this to death. Six and one-half a dozen of another, Your Honor. I mean, we could see this, but wait, there's no one given, that one is superior to the other. This is a judgment call that counsel gets to make, and there's nothing to suggest that the attorney here didn't make recent judgments about this. But the more important thing is, for purposes of this case right now, is the analysis of the state court's disposition of that decision. The state court, of course, determined that there was no basis for relief under Strickland, and it cannot be said that that ruling, that there wasn't a reasonable basis for that ruling, and a fair-minded jurist wouldn't disagree about what Strickland... Certainly, even now, Strickland specifies no one type of conduct. Back then, the body of law... One month before this case was tried. So there wasn't a whole lot out there in terms of instruction to attorneys, and in terms of concrete and specifics, and what they had to do or what was appropriate, and certainly, based on that record, put in its proper temporal context, you could conclude that counsel's performance was within the wide range of professionally acceptable behavior. To take it apart now, because he didn't do A, B, C, or D, is to evaluate it with 20-20 hindsight. And that, Strickland says clearly, you're not supposed to do. Well, but some hindsight, if you look ahead with foresight, you can see that there are certain things spelled out that you need to do. There were a couple other points, too, Your Honors, that I... Well, I sure would like to hear something about prejudice. Clearly, Your Honor, the prejudice decision here, central to it was the fact that Blystone had told his attorney that he did not want any further... or he did not want this evidence put on. And the court, in its determination, indicated that it was thought as a valid waiver of his... Well, now, the Supreme Court of Pennsylvania said that Blystone, quote, refused to allow any other mitigating evidence to be presented on his behalf, end quote. I mean, is that... I mean, counsel made a proffer that it was just going to be his parents, Blystone himself and his parents that were going to be testifying. And for him, that was the whole universe, says your adversary. Is that really any evidence, or is that just the people that counsel is going to call? What's critical here is to actually look at the transcript and see what Mr. Blystone said. And in the passage we quoted in our brief, you will see that during this discussion, Blystone says some words to the effect that he doesn't want anybody involved, and he doesn't want his family, and he says he doesn't want anybody else involved. He doesn't qualify that remark with his family, first of all. So that could fairly be understood to mean anybody, because that's what he said. But even if it's only his family, as his lawyer pointed out, if you take the stand, it's not anybody else being involved here. And again, Blystone said no, no go. And though my opponents here have tried to say that Schreierow is somehow vastly different. In fact, Schreierow is very close to this case. Though I will agree that in Schreierow, the defendant stated his position with more bravado, bring it on. The defendant in this case communicates the same concept. He didn't want anything. And now what we have and what we're looking at is a case of buyer's remorse. We have someone who has changed their mind or is too sure of a newfound interest in pursuing his claim. And that is not the proper focus of the analysis here. The proper focus has to be just as Harrington and Justice Cohen say, whether or not there was a basis for the state court's decision and whether or not fair-minded jurors reasonably disagree that those reasons would be inconsistent or contrary to controlling Supreme Court law. They can't meet that standard here. If after the guilty plea, after the finding of guilt by the jury before the hearing, Blystone changed his mind and said, you know, do whatever you can. Put on whatever you can of mitigating circumstances. I've changed my mind. I want you to do that. Was counsel in a position to do that? No. He hadn't contacted the Navy. He hadn't contacted hospitals. He hadn't contacted various mental health professionals that Blystone had seen, so that he did not have the preparation to put on the panoply of a mitigation plea as Mr. Blystone hypothetically is asking him to do because he should have been working on it for a long time. He would have been able to still mount a case in mitigation. With family members? With the hospital records? Not with those items specifically. He admitted he didn't have those. Right, but should he not have had the preparation to know that they were available and whether or not they would be helpful? I think the answer to that is no because he's not locked into one thing. Yes, he could explore that, but the record does not indicate definitively what information Mr. Blystone had. Mr. Blystone may have been able to discuss this in front of the jury about why he was discharged from the Navy and describe other problems he had. Family members certainly could talk about some of these things, too, so the same territory might be covered in their testimony, though not through the admission of the documents, but you may still cover the same territory, and nothing in the case law says that you can't use an alternative method of communicating information. That's another point I wanted to address, too, about TRIRO, and that is my opponent seems to think TRIRO stands for the proposition that there has to be some kind of affirmative sabotage evident in the record or you have to have some kind of very minutely detailed waiver of your right to present mitigation, and in that I'm talking about a recitation of what I'm going to put on and an affirmative statement. I don't want that from a defendant. There is no controlling supreme court case that says that, and there certainly was none in 1984, so you can't fault in a constitutional sense what occurred here on that basis. It's, again, another attempt to retrofit case law or concepts to the events that occurred here. There are, again, my opponents are very deftly woven together. They're interpretations of facts, and this pertains to both issues here, both the 1959 e-issues and the way they characterize their evidence, and the same thing, too, with respect to their description of trial counsel and his abilities or background, and including such things as a lack of knowledge, his purported lack of knowledge about the constitutional requirements in terms of mitigation, the catch-all. All of this is not established in the record. This is suppositious and cannot properly form part of the analysis. He knew he had an obligation, yes, ma'am. And if you have an obligation, do you have an obligation to determine what your obligation is? One would think, and again, but if you looked at the controlling law back in 1984 or even the ABA standards, he wouldn't have gotten a roadmap to the place that my opponent thinks he would have gotten. There are just generalities in terms of what that obligation was, and that is key here. It could be reasonably understood that by looking to the sources of information available to him at that time, he could have thought this type of presentation of evidence was professionally responsible, and that is key here. That is key to the state court's decision and why there is a suitable basis for it. Is there any expert witness testimony as to the extent of the obligation in 1984? I don't recall, Your Honor. I don't think so, but I honestly can't recall. I think not. But the case law certainly doesn't recognize anything as being written in stone at that point or fixed. And I think that in subsequent ABA guidelines, there is a greater elaboration on this, and in particular a focus in later versions, much later, five years later, dealing with capital cases. Back in 1984, we didn't have that, and a counsel had a general obligation and was left to use discretion that's inherent in his professional representation to carry that out. And that is a principle that necessarily would have informed the state court's analysis. When they made the evaluation, there was this wide-ranging degree of latitude that a counsel had in discretion to make strategic decisions. One of the factors that figures in any case are resources. Also, there are intangible counsel... Just if I could stop you for a minute. You would agree that had counsel asked the court... I mean, it was within the court's discretion to appoint a mental health expert, right? I believe it could have, Your Honor. I don't know exactly what the rules were back at that time, and I'm not sure that the record shows that either. Did you not have investigated that? Should I... Yeah, to know what the court rules were at the time. I didn't tell you that. No, yeah, actually, Your Honor. I mean, I looked at the ADA standards. I did go back and take a look at those for purposes of preparing for this, but no, I did not look at those rules. And I don't know what Pennsylvania provided at the time. I do believe, just knowing the system generally, that for many years and probably at this time, it was from county to county, and it probably controlled a lot by resources. I don't know if, say, a county had a particular series of requirements or anything that was in place. And it would be improper, I think, Your Honor, because I didn't... It's not that information that's not in the record at this point. We have to be focused on what was before the court at the time, and this really wasn't an issue at any point in the state. This has been made later on an issue, but at the time counsel rendered performance, this was not something that was ever raised or challenged at that point. And it really should not be the proper focus of the analysis. If counsel is saying, I couldn't get psychiatric help from the court, and in fact he could have, isn't that an indication of whether or not he was affected? It's something to consider, but I don't think it's an automatic barometer of his competence. It's part of considering the whole context. It's something that could be factored in. He may have, for example, you may have resources available to you, but you may choose not to use them. If you say you don't have them... And if you don't have to, you often have to come up with alternatives. If you say you don't have them and you do, doesn't that put a very different view upon what has happened? I don't think it necessarily can tell a different conclusion. It's something to consider, but at the same time you have to consider whether or not he still got representation that was within the parameters of the range of reasonable competence. There is no constitutional right to the best representation, and the courts have repeatedly said that, but it has to be within the range of reasonably competent, and in this situation, he had reasonably competent representation. Circuit 1984. Thank you, counsel. Just a couple of brief comments on the Rule 59 issue, and then I'll get back to the mediation. With respect to the Rule 59, it's interesting about whether it's a second or successive petition. I think the Commonwealth has correctly conceded that if this court were to reverse the grant of relief on penalty, there'd be no question that the first proceeding had never been finished. If the first proceeding had never been finished and there's no way on earth that there could possibly be a second or successive petition, because you're still in the same petition. When it comes to the question of what time there is and whether counsel is dilatory, Congress determines what's dilatory with the statute of limitations. With respect to newly discovered evidence, they've set forth a one-year time period. Counsel is within that one-year period. It's a paradigmatic abuse of discretion for the lower court to apply the wrong legal standard, and so by definition, it would have been an abuse of discretion by the district court, at least with respect to those claims. In response to the court's question about whether Rule 15 was cited in the Rule 59 motion, it was not specifically cited, but the petitioner did in that specifically request to supplement his claims, and the district court and the Commonwealth were on notice of that. On the mitigation issue, the Commonwealth has brought up the new United States Supreme Court decisions that came out in the context of postcard affirmances by the California court and... I'm sorry, by courts in the Ninth Circuit. They were decisions in which the court did not set forth what its grounds are, and what I think is interesting, in Finholster and Harrington, there's a discussion that what the court has to do is ascertain what the court... what the court would have done or what the court did do, and that's an important distinction because in a postcard affirmance, you have to ascertain what the court might have done. In a case like this, when the court actually did something, you don't have to speculate. You know what the court did, and so the decision that this court has to make is whether that actual decision, the actual reasons presented by the Pennsylvania Supreme Court, not by some hypothetical court that might have decided the case would govern. And one of the really interesting things here is there can be no question whatsoever that what Judge Lancaster here did was exactly what Finholster and Harrington require. You know, he doesn't use the term dual deference, double deference, because that hadn't been invented yet, but what Judge Lancaster did was he applied the Third Circuit standard in Rumpilla, Justice Alito's standard in Rumpilla. It got overturned by the United States Supreme Court later on. He applied a more conservative analysis than would have been required, and in applying that more conservative analysis, he did double deference. He took a look at the facts. He, in fact, disagreed with the state court's determination of one set of facts, but said, I'm bound by it because although I disagree, I can't find that it's unreasonable. He disagreed with the state court's determination of law with respect to the exclusion of the lay witness testimony, but again, he said he couldn't find that that was unreasonable. He did exactly what Finholster and Harrington say you're supposed to do, and then when he looked at the record, he still found that it was unsupported. The state court decision was an unreasonable application and an unreasonable determination of fact, at least with respect to the Department of Corrections-related mitigation and the mental health mitigation. Now, we have reasons why we think he was overly deferential when it comes to lay witnesses, and we've set that out. I don't want to spend more time on it, but it's absolutely clear that if you're looking at double deference, Judge Lancaster did it in state court.